I understand that almost everyone was here, but everyone is here on the first case. And this is how we will proceed. We will hear the first case, Narayanan v. Sutherland Global, with Judge LaValle on the panel. We will then take a short recess, and then we will come back out and hear the rest of the calendar with Judge Wesley on the panel instead of Judge LaValle. Counsel? Good morning, and may it please the Court. I'm John Cudi, and I'm here for the appellant, cross-appellee, and the appellee on the consolidated second appeal, Mutu Narayanan. Sutherland has refused to pay my client the money it owes him because its CEO has a vendetta against him. The record here is very large because we've had to refute numerous baseless defenses that the company has asserted, but the relevant facts are clear. In 2014, TPG, a private equity firm, was about to invest $340 million into Sutherland. In connection with that transaction, Sutherland was required to offer Mr. Narayanan and about 200 other directors or employees the opportunity to net exercise stock options and then sell either 30 percent or 100 percent of the resulting shares back to Sutherland. At first, like most participants, Mr. Narayanan entered into an agreement with Sutherland to sell 30 percent of those shares, but he was getting ready to retire, and he asked the company's CFO, who is a close advisor and confidant of the founder, controlling shareholder, and CEO, Mr. Narayanan asked that the company buy back 100 percent of his shares. The CFO told him he deserved it and he would get it done, and the record is clear at page A1333. Is there evidence of a signed agreement with respect to the 100 percent in the record? There is no — in the record, there is no signed 100 percent agreement. So there's no copy of a signed agreement in the record, but is there evidence that the agreement was signed by Sutherland? It's not clear. In July of 2015, roughly 10 or so months after the October 2014 transaction, there are e-mails from a person at Freed Maxic, which is the accounting firm that was administering the program, to Mr. Russo, who was wearing two hats here, both the CFO of the company and the senior director of the accounting firm. And she asked him, I'm collecting all of the repurchase agreements to send to the corporate secretary for signature. I see Mutu's is in there. Should I send that one? And Russo replied, no. So the inference, I think, is unavoidable, that as late as July of 2015, none of the other repurchase agreements had been signed, yet all those other participants had been paid in October of 2014. So it sounds like what you're saying is it doesn't matter whether there's a signed agreement. It's otherwise binding, even assuming there isn't an agreement? Is that — It is our position that a signature was not required. It's briefed because, as we think, the law is clear, that unless the parties — Even if there's no signed written agreement. That's correct, Judge LaValle, because the law is, as long as the parties agree to be bound, and unless they expressly condition the enforceability of an agreement on a mutually signed writing, the signatures are not required. There is New York law about the exchange of e-mails constituting a binding agreement. The law is quite clear. And, in fact, with respect to the 30 percent sale, which is no longer challenged, although it was vigorously disputed below, the documents make clear that that transaction was consummated the moment the participant sent his signed paperwork back to the company. So we don't think a signature was required. You're also in connection with that arguing ratification through the failure to act once this issue came up. Is that one of your arguments as well? We think there's a — yes. We think there's a powerful ratification argument for the following reasons. There's no dispute that, as I was about to say, at page 8, 1333 of the record, Mr. Russo testified that the CEO told him to direct that Mr. Narayana be permitted to sell 100 percent of his shares. This is a couple of days before the TPG investment closes. On October 21st, there is a spreadsheet created by the accountants that reflect the note of a phone call from Mr. Russo saying, change Narayana from 30 percent to 100 percent. On that very same day, October 21st, 2014, the accounting firm sends my client the paperwork with a cover email saying, here's what you need to do. You've already exercised. Here's what you need to do to sell 100 percent of the resulting shares back to Sutherland. My client signs the documents, sends them back the next day, not just to the accounting firm. He copies Mr. Russo, who's the CFO, and the company's corporate secretary, Satish Raman. Nobody says, wait a second, that's not authorized. In fact, there are spreadsheets created at the time that reflect that my client sold 100 percent. There are even wiring instructions created to pay him. If the issue is whether or not board approval was required, assuming board approval was required, in order to have ratification, wouldn't you have evidence that the board was aware of it and took no action versus Russo being aware of it or the corporate secretary being of board awareness and inaction? No. And let me break that down a little bit. Ratification is in the nature of a stopple, and it functions to supply authorization that was not there at the outset, right? So it cures even an absence of authorization at the time of execution. Here, of course, and I think Orbris made this quite clear, there's no support for the notion that the board was required to approve this 100 percent transaction. There are roughly 200 people who sold shares back, including more than a dozen who sold 100 percent of their shares back. There's not a document in the record that suggests the board was approving each of these transactions. And in fact, in the Is there anything to show that the board wasn't? Is there anything to show that the board didn't just approve all these transactions? It's, it's, there is. And in fact, it's, in fact, it's, there can be no dispute that when Sutherland entered into the agreement with TPG in June of 2014, Sutherland represented that all necessary corporate approvals by officers and directors had been obtained for the TP transaction and all transactions entered into in connection with it. And it's not disputed that these repurchase agreements were entered into in connection with the TPG transaction. So plainly, a board would approve the overall program. It wouldn't be approving transaction by transaction. That's not the way billion-dollar large companies run. And getting back to Judge Bianco's question about ratification, when the agreement comes back from Mr. Narayanan, again, copied to the CFO and the corporate secretary, nobody disavows it, Mr. Narayanan, who's over in India, the deal closes, he starts hearing from his colleagues that everyone's getting paid except for him. So he calls Mr. Russo. Where's my money? Russo tells him, Dilip, the first name in the CEO, the CEO says, we're not paying you until we clear up this WAN transaction matter, which is the subject of the lacrosse appeal. Now, that is not a repudiation of the authorization to enter into an agreement. That's simply the assertion of the setoff. That's not saying, wait a second, we don't have a contract. That's saying, well, we have a contract. We're just not going to pay you until we work this other thing out. And for months this goes on. Mr. Narayanan then follows up on October 31st, sending an email in some detail. Here's what happened. I sent the paperwork back. Everybody else got paid. Where's my money? Does Russo respond to Narayanan and say, what are you talking about, Mutu, there's no deal? No. What does he do? He forwards the email to the accounting and firm and says, don't respond. This goes on for five months. In fact, in November, Mr. Narayanan resigned all of his positions at Sutherland upon the order of the board of the parent and of about 15 or 20 of the subs. They needed his signature and a lot of documents to get that deal closed. And it's only after the deal closed that they announced to him that they're not going to pay him. And they never, until this lawsuit was filed in March of 2015, they never say there wasn't a valid agreement. And when they answer that lawsuit in 2015, they don't assert that there was no authorization to enter into the 100 percent agreement. They say Mr. Narayanan was fired before he could exercise. We didn't let Mr. Narayanan exercise. Mr. Narayanan's options expired before he could exercise. All defenses that we exhaustively litigated and that were entirely baseless and abandoned. And only for the first time on summary judgment briefing did the company say, wait a second, this wasn't authorized by the board, the board needs to authorize it. There's simply no basis for that. They point to the ESOP plan and say that that gives the board sole authority to repurchase shares. I won't bore you. It's laid out in great detail in the briefs. Nothing in the plan remotely says that. It talks about the company's right under the plan to buy back shares in very narrowly circumscribed situations that aren't even arguably present here. You're out of time. We'll hear from the other side and have some rebuttal. Thank you. Good morning. May it please the Court. My name is Joe Schmidt and I'm here on behalf of Sutherland Global Holdings. We are the appellee in the contract issue, the cross-appellant on the breach of fiduciary duty issue, and then the appellant on the consolidated appeal, the third appeal with respect to the Rule 60 motion. Just a few things off the bat. There's absolutely no signed agreement for the 100%. And the 30% was signed in very quick succession after it was received by the company by a very senior executive. It was reviewed. It was signed. Is there not evidence in the record, though, that the parties contemplated a binding agreement without a signed document? Your Honor, it's pretty clear in the record that I think it had to pass mustard. It had to go to the board. It had to at least go to Dilip Velody, the founder of the company and the chairman. Even, I think the strongest thing about this is Section 18 of the ESOP plan, it's unambiguous. I mean, the reason that we've gone down this Mike Russo and Freed Maxick route is because there's absolutely no evidence in the record that it went to the board. There's no evidence in the record that the board delegated it to anybody else or under the agreement that they could delegate it to anybody else because it had to be delegated to a subcommittee, an individual on the board. So we've gotten to Mike Russo. Why is there no evidence in the record that he's, you heard Mr. Cutty, at least 12 other individuals had a 100% repurchase? There's zero evidence in the record that any of the repurchase agreements went to the board. What's your response to that? Why wouldn't there be evidence of all these other individuals going to the board and getting approval? What that is, is that's a spreadsheet kept by an outside accounting firm. The purpose of that spreadsheet was to determine how many shares may or may not be available in order to give to the investor. Because when a private equity investor comes in and buys a large chunk of the company, you have to have shares. Is there any evidence that the board actually approved any of these purchases? We don't have a resolution or anything along those lines, but the company paid these contracts. These are purchase contracts and everything was approved. Are there indications of ratification? Notes in the record, Sutherland paid the withholding tax as if the shares had been purchased. Indications that the only reason they weren't paying was because of the land use dispute. Couldn't a reasonable jury find from those things that indeed it was ratification or apparent authority or actual authority? There's no apparent authority or actual authority. I think the issue here is really at the front end of this. It's their burden. It's not a defense. They have to step forward with somebody that had authority to enter into this contract. And if you look at Mouton-Nerik ... You don't have to have that, right? On the issue of ratification, if the company becomes aware of this issue and takes no action or continues to approve it, what evidence is there in the record that before the summary judgment motion that this was the position of your client? What document in the record, any document in the record indicates prior to the summary judgment motion that they were arguing board approval was necessary? It's in the agreement in the ESOP plan. We didn't, until we got to summary judgment, had to reveal what our strategy was at that point. This is on the issue of ratification. Regardless of what's in the ESOP plan, if when this becomes an issue, the company continues to say it's going to pay and there's no indication that they believe that board approval is needed, none of the other 12 individuals had board approval, regardless of the ESOP, you could have ratification. Yeah. I mean, all I would say on that is there's some dispute as to what those conversations were, but at the end of the day, the — It's a summary judgment. This is summary judgment, right? So we assume the conversations did take place for purposes of this part of the case. But they don't prove authority at the end of the day, Your Honor, because at both times, especially for ratification — The CFO says you've got it. The CFO, if you look in the record, the testimony from Mutu Niriyanen, Mutu Niriyanen specifically says — I think it's on 745 — that he wasn't reacting to Mike Russo saying you got it. Mutu Niriyanen comes up, and it couldn't be clearer to have this kind of objective testimony from somebody pursuing a contract. He came up and said, oh, yeah, I got the thanks a lot, Mr. Russo, and Mike Russo said, oh, oh, you got it, okay. There's no Mike Russo never once in the record said, it's okay, it's been ratified, there's authority. I talked with Dilip, and he said, you got it. Dilip Valodi said, no. Why don't — Mutu — Why don't you move on to the counterclaim? Let me — let me ask you something else about the — about Section 18. You say it's unambiguous, but it seems to me that this section could be read to read — to mean other things. In particular, that it could refer to the — to the requirement of board approval in its sole discretion for a provision in the stock option plan for the company to repurchase shares acquired upon the exercise of stock options. It doesn't say the administrator in its sole discretion may authorize the repurchase. It says the administrator in its sole discretion may authorize that the company may repurchase shares acquired upon the exercise — upon the occurrence of certain events. And then it goes on to say, provided that such repurchase rights shall be set forth in the applicable option agreement or registered stock, all suggesting that this is talking about what the — what the plan would provide to enable the company to reacquire the — the shares or to enable the holder to get the shares purchased by the company in the future on the event of that person's death or whatever the event was. It doesn't seem to me to necessarily require the reading that you're giving it by any means. I would only offer on that, Your Honor, that the — the limiting language under Second It's not limited to just those examples. And at the end of the day, the provided, however, it is in the option agreement. It incorporates the entire plan. Yes, but I'm talking about the meaning of the clause, that it's talking about something that will be — that will be provided in the — in the — in the applicable option agreement. That's anticipatory. It's not talking about — it's not talking about whether the company may decide, hey, today, we're going to repurchase shares. It's talking about the provisions that may be put into the stock option plan to — to — to authorize upon certain future events the repurchase, either for the protection of the option holder or for the protection of the closely held company to keep the — the shares in friendly hands. It — I would — I mean, that hasn't been argued before. But, I mean, I think at the end of the day, that would still require Mr. Russo to have authority. And there's nothing in the record to suggest it would have to be an — in the ordinary transaction. Yes, but addressing it to the question whether board approval was required for this repurchase. In our view, that's where it's been relegated. There's no other evidence that it has been relegated. That's not — that doesn't seem to be supported by the language of Section 18, which you said — which you argued was unambiguous in requiring board approval of this transaction. I think — I mean, in our view, it says sole discretion may provide that the company may. You could say that's authorizing it for future, but at the end of the day, there's nobody else there that it's delegated to, and the administrator can only amend the plan. The administrator, which is the board, is in charge of the plan through and through. And that's the issue at the end of the day. I'm — if I may, on the — Oh, go ahead. Just briefly on the breach of fiduciary duty, it's a very clear record at the end of the day. Any one of the given facts we cited we think in a normal case would have led to at least an issue of fact that would have required a trial. You look at their very first interrogatory responses on A825 of the record. They're speaking in terms of his father and his sister loaning money to the company. He steps in, Narayanan, to pay the bill, and then Ramanan himself pays RJK's money back. The last sentence of that response is another role where one of the partners of RJK comes to him and says, we desperately need some money, and he is told to put it into Ramanan's account. Later on in Narayanan's testimony, he hears that Kamalash is selling personal property, and he writes the lawyer for Ramanan — excuse me, for Kamalash and says, look, that man owes me money. He doesn't separate the two at all. Before we get to the confession, was there evidence in the record that Mr. Narayanan was receiving any benefit out of any of this, personal benefit? The evidence in the record is that the personal benefit is that he needed to keep this company afloat. That's the logical inference when you're opposing a motion for summary judgment. He has friends and relatives that he's helping to prop up. He's recruiting investors. His reputation is on the line. And then we have the confession that really buttresses what we said from day one. At the end of the day, it's crazy. Millions of dollars went out the door, and he testified under oath. He didn't know where the money went. He didn't know if there were contracts with homeowners. That money never came back. They want to point from time to time to the fact that, you know, there's certain representations that he disclosed it, but they were, at best, incomplete. At the end of the day, he never told them about the loans. He never told them about the insight he had. He never told them about the fact that he had tax records from this company. This money was going back and forth between Kamalesh, Ramanan, and RJK. And our money, Sutherland Global's money, has never come back to this day. It's out there somewhere. We've never gotten an explanation, and he's never offered an explanation as to where it is. All right. Thank you. You have some time for rebuttals. Okay. Thank you. Let me start with Judge LaValle's question about Section 18. Section 18, the proviso of Section 18, makes clear that the only repurchase right has to be set forth in the applicable option agreement. Mr. Narayanan's option agreement is at A2361. It refers to two different kinds of repurchases that might happen. One is a first — a right of first refusal, and the other is called a call option. And as explained in the briefs, none of those ever happened. So there was no repurchase right referred to in here. That means Section 18 doesn't give the Board approval. Let me talk about the counterclaim, because a fair amount of misinformation just got dumped on you. RJK is a company that Mr. Narayanan asked some friends to loan money to and his father loaned money to them, all before he was in charge of the land transaction process. The money was still owed. It wasn't a prior issue. He was a creditor at the time all these other transactions were occurring. The critical fact, though, which is not disputed, is that RJK was not a party to any of the transactions themselves. The contract between Mr. Kumar was with Mr. Ramanan. If RJK is asking for money because they need money, and they're told, he's told to pay the $300,000 to Ramanan, why isn't that an indication that they're operating together, that Ramanan and RJK are operating together? First of all — He's paying the money to Ramanan. It's 300,000 rupees, which is about $4,500, which gets to materiality, which I'll end with. The record — there's no disputes. The contract was with Ramanan. Every advance, contemporaneously recorded, check signed by two Southern employees was sent to Ramanan, not RJK. Ramanan — there's this notion that RJK was desperate for money. When land prices were rising and the company had to change tack in November of 2014, Ramanan posted mortgages worth 385 million rupees. He was a person of means. He is not RJK. He was not the counterparty. What their argument is, all it is, is that Mr. Narayanan's lacked independence, that his discretion was sterilized because he was owed about $120,000 in loans. There's nothing in the record that shows that's material. The public confession seems to be, at first glance, fairly significant. It is — The statement that Mr. Narayanan was getting a kickback? As the Indian authorities have found, it's entirely unreliable. That confession says that Mr. Narayanan was advancing money on behalf of the Sutherland to Ramanan from 2006 to 2009. The subsidiary didn't even exist during that period. It wasn't formed until 2010. All of the details are wrong. It wouldn't be admissible because he's trying to shift blame to Mr. Kamalash and Mr. Narayanan. It has — it doesn't square with any of the facts in the record. And it's no surprise that when Deloitte, the auditor for this company, learned that this counterclaim had been filed, the audit partner immediately went to the CFO and said, you're claiming that Narayanan engaged in fraud and self-dealing. Where's your evidence? They told the auditor year after year that they have no evidence that he got any personal benefit from this transaction. What about no land was registered, multiple advances were made against the same parcel of land. They cite one instance where the money advance was greater than the value of the land, signed undated checks. Why isn't that some evidence? Simply incorrect. Eleven acres were acquired between 2010 and 2011, with one parcel acquired in 2013. That land doubled in value. Prices were rising dramatically. The company wanted to get all these 26 acres acquired for a fixed price. It was impossible because landowners weren't selling. So what happened? There was an internal memorandum signed by the CEO and Mr. Narayanan in November of 2014 reciting the fact that because prices were rising so quickly, it would be impossible to get the other 15 acres, and they were going to look in another region. And Ramanan signed an undertaking saying, yes, you sent me all these advances. I'm going to give you security for them. Those undated checks under Indian law are a form of security in addition to the promise of rain oaks. Why would you advance more money than the value of the land? That was in one case because, and that's the one parcel that was actually registered in July of 2013, because the landowner was holding out for more in this rising price environment and Mr. Narayanan made the judgment to get the parcel acquired. Before, a few months later, the company said, you know what, it's not going to happen. The values are going up too quickly. The 11 acres acquired under Mr. Narayanan's supervision doubled in value in two years. And Ramanan gave the company mortgages, which they have represented to Deloitte time and again, that are worth more than the total amount of advances. And that's why these advances, which are in the nature of loans or deposits, they are carried to this day on their audited global financial statements as assets secured by these mortgages. The money is not missing. Everyone knows where the money is. It went to Ramanan. All right. Thank you. We'll hear from the other side. Thank you, Your Honor. Just a few things here. The money is absolutely missing. Nobody knows where it is. Nobody has been told where it is. It's never been returned. And the CEO in the declaration down below made it clear they were looking to register land or get the money back and they could just never get a straight answer out of anybody. And that's why Ramanan, as we understand it, has absconded again. The $4,500, it's absolutely material because at this point as a fiduciary, he's giving millions of dollars out the door. He's getting nothing in return. It's a flag, an inference that something is wrong. It's such a small amount of money is what makes it so scary. Why did he need it? Plus, why was he told to give it to Ramanan? He was told to give it to Ramanan because they were commingling funds. It was all one operation. And that's to that interrogatory response and Mutu's testimony that backs it up. When RJK owed him money, it came from Ramanan personally. When RJK needed money, it went to Ramanan. For the land deed and the money going across the board in this transaction, this fraud, it went to Ramanan. It's all the same. The inference is Southern Global got taken. Indian Authority, completely inadmissible. I mean, if you look at the Rule 60 motion, it says, based on the Indian Authority, I have reservations about the admissibility of the document. We don't know what went on there. It's a statement by a police officer in India. We don't know what influenced them, etc. There's no argument, nor has there ever been that it would be admissible. Interpreting the auditor statements, again, there's a lot of hearsay there. But the important point is, I think what those statements say when you really put them down and read them is, we don't know exactly what went back to, what money went back to Mutu. And that was always the question. What went back to Mr. Narayanan? Now we have the confession. And that's why we really have an issue of fact. Same with the memo. It doesn't explain away anything. It doesn't prove where the money went. We don't have the money. The money is missing. It's absolutely missing. Ramanan never told us where it is. Narayanan never told us where it is. We've never had a homeowner that's been identified, hey, it's in our bank account. That's why there's issues of fact on the breach of fiduciary duty. At the end of the day, that confession, it's an authentic document. We all agree where it came from. It's admissible as a statement against interest. And a trier of fact ought to hear about it. Thank you.